IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

BUCCANEER ENERGY (USA) INC., a
Nevada corporation,

    Plaintiff,

v.

GUNNISON ENERGY CORPORATION, a Delaware
corporation,
SG INTERESTS, I, LTD., a Texas limited partnership, and
SG INTERESTS VII, LTD., a Texas limited partnership,

    Defendants.

_____

**COMPLAINT**
_____

Buccaneer Energy (USA) Inc. ("Buccaneer"), by its attorneys, states the following Complaint against Gunnison Energy Corporation ("Gunnison Energy"), SGI Interests I, Ltd. ("SGI") and SG Interests VII, Ltd. ("SGVII"):

**INTRODUCTION**

1.    This action involves the Defendants' activities in restraining the production, gathering, processing, transportation and sale of natural gas from the Ragged Mountain Field and adjacent areas in Delta and Gunnison Counties, Colorado (the "Ragged Mountain Area") in violation of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1,2, and the common law of Colorado.

2.    Defendants own and control a facility that is essential for gathering, processing

and transporting natural gas from the Ragged Mountain Area. Defendants have unlawfully restrained competitors' access to that facility to drive competitors out of the markets for the production and sale of natural gas from the Ragged Mountain Area and to increase their own economic power in those markets.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over this matter pursuant to Section 4 of the Clayton Act, 15 U.S.C. §15(a) and 28 U.S.C. §§1331, 1337(a), and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 and *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).

4. Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§15(a), 22, and under 28 U.S.C. §1391 because the Defendants transact business and are found within this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

5. Plaintiff Buccaneer is a Nevada corporation authorized to do business in the State of Colorado. Buccaneer's corporate office is located at 36998 Timber Drive, Elizabeth, Colorado 80107. Buccaneer was formed to produce and sell natural gas from wells in the Ragged Mountain Area for use outside the State of Colorado.

6. Defendant Gunnison Energy is a Delaware corporation authorized to do business in the State of Colorado. Gunnison Energy's corporate offices are located at 1801 Broadway, Suite 1200, Denver, Colorado 80202. Gunnison Energy is engaged in the production, gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area for use outside

the State of Colorado.

7. Defendant SGI is a Texas limited partnership authorized to do business in the State of Colorado. SGI's office address is 100 Waugh Drive, Suite 400, Houston, Texas 77007. SGI is engaged in the production, gathering and sale of natural gas from the Ragged Mountain Area for use outside the State of Colorado.

8. Defendant SGVII is a Texas limited partnership authorized to do business in the State of Colorado. SGVII's office address is 100 Waugh Drive, Suite 400, Houston, Texas 77007. SGVII is engaged in the production, gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area for use outside the State of Colorado.

## CO-CONSPIRATORS

9. Russell D. Gordy ("Gordy") is an individual residing in Houston, Texas. Gordy is an owner of SG Interests, Inc. and Gordy Oil Company, which is the general partner of SGVII. Gordy personally participated in the activities described herein on behalf of SGI, and SGVII.

10. Robert H. Guinn, II ("Guinn") is an individual residing in Houston, Texas. Guinn is vice president of SGI and SGVII. Guinn personally participated in the activities described herein on behalf of SGI and SGVII.

11. William Koch ("Koch") is an individual residing in West Palm Beach, Florida. Koch is the chief executive officer of Gunnison Energy. Koch personally participated in the activities described herein on behalf of Gunnison Energy.

12. M. Brad Robinson ("Robinson") is an individual residing in Jefferson County, Colorado. Robinson is president of Gunnison Energy. Robinson personally participated in the activities described herein on behalf of Gunnison Energy.

**TRADE AND COMMERCE**

13.     Defendants are engaged in, and their activities substantially affect, interstate commerce.  Natural gas produced, gathered, processed and transported from the Ragged Mountain Area is sold and delivered in interstate commerce through, among other locations, the Opal Hub in Southwestern Wyoming.  The Ragged Mountain Area currently is producing more than four million cubic feet ("MMcf") of natural gas per day, with anticipated future production of more than 200,000 MMcf per day.

14.     Gunnison Energy, SGI and SGVII were direct competitors with Buccaneer in the production and sale of natural gas from the Ragged Mountain Area.

**GENERAL ALLEGATIONS**

15.     The Ragged Mountain Area is located southwest of Carbondale, Colorado in Gunnison and Delta Counties, Colorado.  An estimated 10 trillion cubic feet of natural gas exists in the Area -- enough to satisfy the demand of the entire state of Colorado for more than fifteen years.

16.     Natural gas is produced at the "wellhead," where it typically is collected and delivered through low-pressure gas gathering pipeline systems to processing facilities.  Natural gas includes various hydrocarbons such as propane, butane, etc., which are removed and recovered from natural gas in liquid form through processing and sold separately.  The remaining gas, known as residue gas, is usually then transported to high-pressure transmission pipelines for delivery to end users in interstate commerce.

17.     The Ragged Mountain Area was served by a single natural gas gathering system, processing facility and transportation pipeline known collectively as the Ragged Mountain

System. The System delivered natural gas produced from the Ragged Mountain Area to the high-pressure Rocky Mountain Pipeline for transmission to end users outside the State of Colorado. The System is capable of gathering, processing and transporting up to 10 MMcf of natural gas per day (i.e. "10,000 Mcfd").

18.     Riviera Drilling & Exploration Company ("Riviera") is a family owned business that produced natural gas in the Ragged Mountain Area since 1983. Natural gas produced by Riviera was gathered, processed, transported and sold through the Ragged Mountain System. In the mid-1980s, Riviera acquired part of an interest in an oil and gas lease entitling it to develop and produce natural gas from property owned by the McIntyre Livestock Corporation (the "McIntyre Lease") in the Ragged Mountain Area.

19.     Sometime in the late 1990s and early 2000s, the Ragged Mountain Area became an area of interest for the production of natural gas from coal. Prior to 2005, Defendants were separately engaged in exploration and development of natural gas resources in the Ragged Mountain Area; Gunnison Energy actively competed with SGI and SGVII for mineral leases entitling them to develop and produce natural gas in the Area.

20.     In January 2001, SGVII acquired the remaining interest in the McIntyre Lease not owned by Riviera, entitling SGVII to develop and produce natural gas from property owned by the McIntyre Livestock Corporation in the Ragged Mountain Area.

21.     In July 2005, Gunnison Energy and SGVII (through affiliated entities) purchased the Ragged Mountain System. Gunnison Energy and SGI also purchased the oil and gas leases owned by the previous owners of the System in the Ragged Mountain Area, and Gunnison Energy and SGI own undivided interests in those leases.

22. At or about the same time, Gunnison Energy entered into an agreement with SGI for an area of mutual interest within the Ragged Mountain Area. That agreement provided each of them with an interest in oil and gas leases acquired by the other in the future. As a result of that agreement, Gunnison Energy and SGI no longer competed against each for mineral leases in the area of mutual interest, including bidding at open auctions for leases of mineral interests on federal lands made available within the area of mutual interest. Instead, SGI participated at those auctions and successfully obtained all federal leases made available within the area of mutual interest. Shortly after obtaining those leases, SGI assigned an interest in them to Gunnison energy.

23. Since acquiring the Ragged Mountain System, Gunnison Energy added a lateral pipeline known as the Sheep Park Gas Lateral Pipeline to the System, and SGI added a lateral pipeline known as the Henderson Lateral Pipeline to the System to accommodate additional natural gas production by them within the Ragged Mountain Area.

24. As a result of the acquisition of the Ragged Mountain System and subsequent additions made by them to the System, Defendants, by contract and combination, owned and controlled 100% of the then-existing market for natural gas gathering, processing and transportation in the Ragged Mountain Area.

25. Pursuant to agreement between Gunnison and SGVII, Gunnison Energy operates and controls access to the System, and SGI and SGVII have acquiesced in or otherwise agreed to the terms and conditions established by Gunnison Energy for access to the System.

26. The Ragged Mountain System was essential to Plaintiff Buccaneer, Riviera and other producers' ability to conduct business in and compete for the production and sale of natural

gas from the Ragged Mountain Area. Defendants had the ability and capacity to provide reasonable access to the System. Pursuant to 30 U.S.C. §185(r) and 36 CFR §251.56, special use permits issued by the United States Forest Service for operation of the System on federal lands required the System to be operated as a common carrier and to "accept, convey, transport, or purchase without discrimination all oil or gas delivered" to it. Defendants further represented and held themselves out to the public as being common carriers with respect to operation of the System.

27. There was no practicable or reasonable means of duplicating the Ragged Mountain System because of capital costs and regulatory barriers associated with the construction and operation of gathering systems, processing facilities and transportation pipelines in the Ragged Mountain Area. Those barriers include the need to obtain special use and other permits from, among other agencies, the United States Forest Service, the Bureau of Land Management, the U.S. Environmental Protection Agency, the Army Corps of Engineers, the State of Colorado, and Gunnison County, Colorado. Potential competitors are prevented from entry into the Ragged Mountain area by those same factors.

28. In conjunction with the acquisition of the Ragged Mountain System, Gunnison Energy and SGI also entered into an agreement for the construction of the Bull Mountain Pipeline and associated compressor station and treating and processing facilities. The Bull Mountain Pipeline is a 20-inch diameter buried steel gas pipeline that extends approximately 25.5 miles through Gunnison, Delta, Mesa and Garfield Counties, Colorado, and connects to the Questar interstate natural gas pipeline.

29. The Bull Mountain Pipeline was designed to transport current and future natural

gas production from the Ragged Mountain Area to interstate commerce. The Bull Mountain Pipeline will be capable of delivering approximately 375 MMcf of natural gas per day (or 375,000 mcfd) into interstate commerce. The total costs of the Bull Mountain Pipeline and associated facilities to date are approximately $80 million.

30.     Completion of the Bull Mountain Pipeline further increased Gunnison Energy's and SGI's ability to exclude competition from and control prices for the markets for the existing and future production, gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area. Because of the capacity of and regulatory barriers associated with the Bull Mountain Pipeline, it will further foreclose entry of competition for the existing and future production, gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area.

31.     Prior to Gunnison Energy's and SGVII's operation of the Ragged Mountain System, the gathering fee for transporting gas on the System ranged from $0.33 per one thousand cubic feet ("Mcf") to $0.55 per Mcf (or $0.33 per one million British thermal units ("MMBtu") to $0.55 per MMBtu).[1]

32.     Following the acquisition of the Ragged Mountain System in 2005, Gunnison Energy, as operator of the System, entered into a short-term natural gas purchase agreement with Riviera in which it purchased gas from Riviera at $0.785 per MMBtu (or $0.785 per Mcf @

---

[1] An Mcf is one thousand standard cubic feet of natural gas. An MMcf is one million standard cubic feet of natural gas, or 1000 Mcf. A cubic foot of natural gas contains approximately 1000 British thermal units ("Btu"). One Mcf (i.e. one thousand cubic feet of natural gas) is approximately equivalent to one million Btu ("MMBtu"). Unprocessed natural gas in the field often contains more (or less) than 1000Btu per cubic foot; transportation rates are often charged on an MMBtu basis rather than on an Mcf basis.

1000Btu/cf) and gathered, processed, transported and sold Riviera's gas through the System. That agreement was terminable on five days written notice.

33.     Plaintiff Buccaneer's president, Tony Gale, had more than 20 years of experience in the oil and gas industry and had been previously employed by Gunnison Energy as senior vice president of operations for 5 years.  Consequently, Gale had first-hand knowledge of and experience with natural gas exploration, development and production in the Ragged Mountain Area.  Mr. Gale had been responsible for developing natural gas wells and obtaining federal, state and local permits for the exploration, development and production of natural gas in the Area.

34.     In the Spring of 2007, Buccaneer's President Tony Gale approached Gunnison Energy and asked Gunnison Energy's President Brad Robinson if Gunnison Energy had a problem with Buccaneer trying to negotiate a purchase of Riviera's assets. Robinson informed Gale that it would be beneficial for Gunnison Energy if Buccaneer bought out Riviera.  The agreement with Riviera took nearly a year to negotiate.

35.     Gunnison Energy informed Riviera by letter dated September 17, 2007, that it was terminating its short term natural gas purchase agreement with Riviera effective October 1, 2007, and that it would begin charging Riviera $1.52 MMBtu (or $1.52/Mcf @1000 Btu/cf) to transport natural gas through the Ragged Mountain System.  Gunnison Energy also informed Riviera that it was changing the historical manner by which Riviera would be allowed to transport gas produced by it through the System.

36.     The Ragged Mountain System delivered natural gas into the Rocky Mountain Natural Gas transmission pipeline, which imposed limitations of 2% on the amount of carbon dioxide allowed in gas entering the pipeline.  Some wells on the Ragged Mountain System had

produced gas containing levels of carbon dioxide higher than 2%, while other wells on the System had produced gas containing levels of carbon dioxide lower than 2%. The System historically had met Rocky Mountain Natural Gas' 2% carbon dioxide limitation by using the industry's standard practice of blending all the gas on the System so that, as a whole, it met Rocky Mountain Natural Gas' carbon dioxide limit.

37. Gunnison Energy informed Riviera that it would no longer "blend" Riviera's gas with other gas on the System and would require Riviera to treat gas produced from each of its wells to meet Rocky Mountain Natural Gas' 2% carbon dioxide limit before entering the System, which would require that individual scrubbers be placed on Riviera's wells at significant costs.

38. Meanwhile, Defendants continued to use the standard practice of blending their own gas on the Ragged Mountain System to meet Rocky Mountain Natural Gas' 2% carbon dioxide limit and later acknowledged that blending gas on the System did not cost them anything.

39. In early 2008, Gale again approached Robinson and asked if Gunnison Energy would transport the gas if Buccaneer entered into a deal to acquire Riviera's leasehold interests. Gale was told that Gunnison Energy would transport the gas.

40. On March 4, 2008, knowing that Gunnison Energy was required to transport the gas under reasonable, non-discriminatory terms under the common carrier provisions, Plaintiff Buccaneer entered into a Lease and Purchase Agreement with Riviera in which Buccaneer agreed to purchase all of Riviera's assets in the Ragged Mountain Area for $32 million.

41. The Lease and Purchase Agreement provided Buccaneer with a two-year option period in which Riviera subleased its production to Buccaneer in exchange for payments of $45,000 per month. Buccaneer was also obligated to drill four wells on Riviera's leaseholds

(three gas wells and one water disposal well) during the option period.  If Buccaneer did not exercise the option, Riviera was to retain ownership of the wells and production from the wells.

42. Buccaneer anticipated using the cash flow from Riviera's production to meet most of its monthly $45,000 obligations and to demonstrate production so that it could raise capital to exercise the purchase option and develop the Riviera property.

43. Immediately after entering into the Riviera Lease and Purchase Agreement, Buccaneer's President Gale contacted Gunnison Energy's President Robinson and requested an agreement to transport gas on the Ragged Mountain System.

44. Gunnison Energy's President Robinson prepared a "transportation term sheet" that set out terms for Buccaneer's transportation of gas from Riviera's leasehold interests on the Ragged Mountain System and the Bull Mountain Pipeline.  The sheet indicated that Buccaneer would be allowed to transport gas for $1.52 per MMBtu for the first 1,000,000 MMBtus (or 1000Mcf/d @ 1000 Btu/cf) and then $1.00 per MMBtu (or $1.00/Mcf @ 1000 Btu/cf) thereafter for all gas transported.

45. The "transportation term sheet" further indicated that Buccaneer would be allowed to transport gas for $.25 per Mcf in exchange for conveying up to a 30% working interest to Gunnison Energy in the properties Buccaneer acquired from Riviera.

46. However, Gunnison Energy did not provide Buccaneer a draft transportation agreement until June 30, 2008, when it proposed to Buccaneer a transportation agreement that again demanded $1.52 per MMBtu (or $1.52/Mcf @ 1000 Btu/cf) and further provided that Buccaneer's gathering, processing and transportation of gas could be interrupted at any time for any reason.

47.     Although Buccaneer believed the gathering rate of $1.52 per MMBtu (or $1.52/Mcf @1000 Btu/cf) was unreasonable, Buccaneer acquiesced to that rate because it had no alternative means of transporting and selling its gas.  However, Buccaneer objected to Gunnison Energy's proposal that service could be interrupted at any time for any reason.

48.     Gunnison Energy responded by refusing to enter into a non-interruptible agreement with Buccaneer and by increasing the gathering fee it was demanding from the previously quoted $1.52 per MMBtu (i.e. Mcf @ 1000 Btu/cf) to $3.92 per MMBtu (Mcf @ 1000 Btu/cf).

49.     Buccaneer and its attorney then met with Gunnison Energy and its attorney in an effort to work out a mutually agreeable transportation agreement.  Buccaneer requested the information Gunnison Energy relied upon to justify the high transportation rate.  Gunnison Energy refused to provide information about the costs and other economic factors forming the basis for those charges, which reflect monopolistic pricing.

50.     In an attempt to salvage the Lease and Purchase Agreement with Buccaneer, Riviera resumed its own, separate efforts to obtain access to the Ragged Mountain system.  On August 27, 2008, Riviera asked Gunnison Energy for a transportation agreement for the Ragged Mountain System and one for the Sheep Park Gas Gathering System lateral so it could drill a new well and hook up an existing well.  Riviera also asked if it could locate a single carbon dioxide treatment unit on either its Federal #30-2 well or its Federal #10-90-32 well location to treat gas from all of its wells as it flowed through the Ragged Mountain System.  Riviera also asked SGI for a transportation agreement for the Henderson Lateral so it could drill a well and hook up yet another existing well.

51. Gunnison Energy provided Riviera with the same interruptible transportation agreement it had provided to Buccaneer, with a gathering rate of $3.92 per MMBtu (i.e. $3.92 Mcf @ 1000 Btu/cf) and indicated that a similar agreement would apply to transportation on the Sheep Park Gas Gathering System lateral. Gunnison Energy indicated that Riviera might be able to locate a single carbon dioxide treatment unit at its Federal #30-4 well location. However, when Riviera pursued that offer Gunnison Energy withdrew its acceptance. Gunnison Energy told Riviera that its gas would have to be treated for $CO_2$ removal before it entered the Ragged Mountain System. Gunnison Energy also informed Riviera that it would need production data from the well before it could be hooked up to the Sheep Park lateral pipeline.

52. SGI responded to Riviera's request for transportation on the Henderson Lateral by indicating that Riviera would have to provide production data from the well to be drilled and hooked up.

53. Riviera objected to Gunnison Energy's and SG I's requirements that it drill wells and provide production data before knowing the terms of transportation, as it would be imprudent to invest time and money into drilling and completing wells without knowing whether it would be allowed reasonable access to a pipeline.

54. On November 24 and 26, 2008, Buccaneer again requested transportation on the Ragged Mountain System and the Bull Mountain Pipeline and offered to buy a portion of the Bull Mountain Pipeline.

55. On December 11, 2008, Gunnison declined Buccaneer's offer. However, Gunnison Energy proposed a "broader transaction" in which Gunnison Energy would participate in the development of Riviera's leasehold interests. Gunnison Energy's participation in the

development of Riviera's leasehold interests was unacceptable to Buccaneer because it would jeopardize control over the investment and the timing of the development necessary to fund the acquisition of those interests.

56.     The effect of the price increases and other conditions imposed by Defendants rendered: (1) access to the System unreasonable and uneconomic; (2) Buccaneer's performance under the Lease and Purchase Agreement impossible; and (3) prevented Buccaneer, Riviera and other competitors from producing and selling natural gas from the Ragged Mountain Area.

57.     Throughout the relevant time period, Buccaneer expended substantial time and resources in complying with its obligations under the Lease and Purchase Agreement and in developing Riviera's interests in the Ragged Mountain Area for the increased production and sale of natural gas contemplated under the Agreement.  A readily available market has existed for the sale of natural gas produced from the Ragged Mountain Area, and natural gas brokers and other purchasers have been and continue to be ready, willing and able to enter into contracts for such gas.

58.     Defendants' conduct has had, and is continuing to have, the following effects, among others, within the relevant markets:

     a.     Competition in the markets for producing, gathering, processing, transporting and selling natural gas has been reduced or eliminated;

     b.     Consumers of gas gathering, processing and transportation, such as Buccaneer, Riviera and other oil and gas producers, have been subjected to increased prices and reduced output for those services;

     c.     Defendants have acquired and exercised the power to exclude competition

and control prices for gathering, processing and transporting natural gas;

    d. Defendants have used the power to exclude competition and control prices for gathering, processing and transporting natural gas to acquire the power to exclude competition and/or control prices for the production and sale of natural gas; and

    e. Natural gas production and sales have been reduced.

## RELEVANT MARKETS

59. The Ragged Mountain Area constitutes the area of effective competition and is the relevant geographic market. The term "Ragged Mountain Area" as used in this Complaint refers to that area encompassed within Townships 10 South to 12 South and Ranges 89 West to 91 West.

60. There is no practical substitute for the production, gathering, processing, transportation and sale of natural gas, which constitute the relevant product markets.

## FIRST CLAIM FOR RELIEF
### (Refusal to Deal in Violation of Section 1 of the Sherman Act, 15 U.S.C. §1)

61. Plaintiff realleges and incorporates all previous paragraphs of this Complaint.

62. Defendants had exclusive ownership and control over the Ragged Mountain System, which was essential to effective competition for the production and sale of natural gas from the Ragged Mountain Area, and had the ability to control prices and exclude competition in the Ragged Mountain Area for the production, gathering, processing, transportation and sale of natural gas.

63. Defendants contracted, combined and conspired to restrain competition in the relevant markets.

64. Defendants took steps in furtherance of their contract, combination and conspiracy by, among other things, refusing to deal with, or to deal only on specific terms with, competitors and consumers of natural gas gathering, processing and transportation services so as to deny reasonable access to the Ragged Mountain System.

65. Defendants' conduct violated Section 1 of the Sherman Act, 15 U.S.C. §1.

66. As a result of Defendants' conduct, Buccaneer suffered injury to its business or property.

## SECOND CLAIM FOR RELIEF
**(Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. §2)**

67. Plaintiff realleges and incorporates all previous paragraphs of this Complaint.

68. Defendants combined and conspired to monopolize the markets for the production, gathering, processing, transportation and sale of natural gas in the ragged Mountain Area.

69. Defendants took steps in furtherance of their combination and conspiracy by, among other things:

    a. acquiring 100% ownership and control over the Ragged Mountain System and the Bull Mountain Pipeline;

    b. refusing to deal with, or to deal only on specific terms with, competitors and consumers of natural gas gathering, processing and transportation services so as to deny reasonable access to the Ragged Mountain System;

    c. refusing to provide terms and conditions of access to the Ragged Mountain System for new wells, thereby preventing development of new production because of the

economic uncertainty of the cost of access to markets;

        d.    allowing themselves access to the Ragged Mountain System on terms and conditions more favorable than those available to competitors; and

        e.    entering into agreements to share in each others' leases of mineral interests for the production of natural gas in the Ragged Mountain Area.

70. As a result of their conduct, Defendants had exclusive ownership and control over the Ragged Mountain System, which was essential to effective competition for the production and sale of natural gas from the Ragged Mountain Area, and had the ability to control prices and exclude competition in the Ragged Mountain Area for the gathering, processing and transportation of natural gas. Defendants also created a dangerous probability of success in obtaining the ability to control prices and exclude competition in the Ragged Mountain Area for the production and sale of natural gas.

71. Defendants' conduct was undertaken with the specific intent to monopolize the production, gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area.

72. Defendants' conduct violated Section 2 of the Sherman Act, 15 U.S.C. §2.

73. As a result of Defendants' conduct, Buccaneer suffered injury to its business or property.

### THIRD CLAIM FOR RELIEF
### (Tortious Interference With Prospective Business Advantage Or Relation)

74. Plaintiff realleges and incorporates all previous paragraphs of this Complaint.

75. Buccaneer had a reasonable likelihood or probability of entering into a contract

with natural gas brokers or other purchasers for the sale of natural gas from the Ragged Mountain Area.

76. Defendants knew or reasonably should have known of Buccaneer's prospective contracts.

77. By their conduct, Defendants intentionally interfered with the performance of Buccaneer's prospective contracts by making performance impossible or more difficult.

78. Defendants' conduct was improper or otherwise wrongful.

79. Defendants' conduct was willful and wanton.

80. As a result of Defendants' conduct, Buccaneer suffered injury to its business or property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

A. With respect to Buccaneer's First Claim for Relief under Section 1 of the Sherman Act, 15 U.S.C. §1, an award of threefold the amount of damages actually sustained by Buccaneer, in an amount to be determined at trial, and attorney fees and costs;

B. With respect to Buccaneer's Second Claim for Relief under Section 2 of the Sherman Act, 15 U.S.C. §2, an award of threefold the amount of damages actually sustained by Buccaneer, in an amount to be determined at trial, and attorney fees and costs;

C. With respect to Buccaneer's Third Claim for Relief, an award of the amount of damages actually sustained by Buccaneer, in an amount to be determined at trial, and exemplary damages;

D. Interest and any other damages, fees and costs to the fullest extent permitted under

all applicable law; and

    J.    Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

                              WILLIAM A. COHAN, P.C.

DATED: June 21, 2012            By:  s/ *William A. Cohan*
                                        WILLIAM A. COHAN
                              Colo. Bar 7426; Calif. Bar 141804
                              P.O. Box 3448
                              Rancho Santa Fe, CA 92067
                              (858) 832-1632
                              (858) 832-1845 (FAX)
                              Email: bill@williamacohan.com


                              PETERS|MAIR|WILCOX
                              ATTORNEYS AT LAW

DATED: June 21, 2012            By:  s/ *Ronald L. Wilcox*
                                        RONALD L. WILCOX
                              Colo. Bar 1352
                              1755 Blake Street, Suite 240
                              Denver, CO 80202
                              (303) 393-1704
                              (303) 399-8333 (FAX)
                              Email: rwilcox@peterslaw.net

                              Attorneys for Plaintiff BUCCANEER ENERGY
                              (USA), INC.

PLAINTIFF'S ADDRESS:
Buccaneer Energy (USA), Inc.
36998 Timber Drive
Elizabeth, CO 80107