IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.  1:12-cv-01618

BUCCANEER ENERGY (USA) INC.,

      Plaintiff,

v.

GUNNISON ENERGY CORPORATION,
SG INTERESTS I, LTD, and
SG INTERESTS VII, LTD.,

      Defendants.

## FIRST AMENDED COMPLAINT

Buccaneer Energy (USA) Inc. ("Buccaneer"), by its attorneys, states the following

First Amended Complaint against Gunnison Energy Corporation ("GEC"), SG Interests

I, Ltd. ("SG I") and SG Interests VII, Ltd. ("SG VII"):

## <u>INTRODUCTION</u>

1.    This action involves the Defendants' activities in restraining  production

rights to and the gathering, processing, transportation and sale of natural gas from the

Ragged Mountain Field and adjacent areas in Delta and Gunnison Counties, Colorado

(the "Ragged Mountain Area") in violation of sections 1 and 2 of the Sherman Antitrust

Act, 15 U.S.C. §§ 1, 2.

2.    Defendants owned and controlled a facility that was essential for

producing, gathering, processing and transporting natural gas from the Ragged

Mountain Area.  Defendants unlawfully restrained competitors' access to that facility to

drive competitors out of the markets for  production rights to and the sale of natural gas

from the Ragged Mountain Area and to increase their own economic power in those markets.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over this matter pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a) and 28 U.S.C. §§ 1331, 1337(a), and this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and under 28 U.S.C. § 1391 because the Defendants transact business and are found within this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

5.      Plaintiff Buccaneer is a Nevada corporation authorized to do business in the State of Colorado.  Buccaneer was formed to acquire production rights to and sell natural gas from wells in the Ragged Mountain Area for use in and outside the State of Colorado.

6.      Defendant GEC is a Delaware corporation authorized to do business in the State of Colorado.  GEC's corporate offices are located at 1801 Broadway, Suite 1200, Denver, CO 80202.  GEC is engaged in the acquisition of production rights in and the gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area for use in and outside the State of Colorado.

7.      Defendant SG I is a Texas limited partnership authorized to do business in the State of Colorado.  SG I's office address is 100 Waugh Drive, Suite 400, Houston,

TX 77007.  SG I is engaged in the acquisition of production rights in and the gathering and sale of natural gas from the Ragged Mountain Area for use in and outside the State of Colorado.

8.      Defendant SG VII ("SG VII") is a Texas limited partnership authorized to do business in the State of Colorado.  SG VII's office address is 100 Waugh Drive, Suite 400, Houston, TX 77007.  SG VII is engaged in the acquisition of production rights in and the gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area for use in and outside the State of Colorado.

## CO-CONSPIRATORS

9.      Russell D. Gordy ("Gordy") is an individual residing in Houston, Texas. Gordy is an owner of Gordy Oil Company, which is the general partner of SG I and a general partner of SG VII.  Gordy personally participated in the activities described herein on behalf of SG I and SG VII.

10.     Robert H. Guinn, II ("Guinn") is an individual residing in Houston, Texas. Guinn is vice president of SG I and SG VII.  Guinn personally participated in the activities described herein on behalf of SG I and SG VII.

11.     William Koch ("Koch") is an individual residing in West Palm Beach, Florida.  Koch is an officer and director of GEC.  Koch personally participated in the activities described herein on behalf of GEC.

12.     M. Brad Robinson ("Robinson") is an individual residing in Jefferson County, Colorado.  Robinson is president of GEC.  Robinson personally participated in the activities described herein on behalf of GEC.

## TRADE AND COMMERCE

13.     Defendants are engaged in, and their activities substantially affect, interstate commerce.  The acquisition of production rights attracts interstate investments, and natural gas produced, gathered, processed and transported from the Ragged Mountain Area is sold and delivered in interstate commerce through, among other locations, the Opal Hub in Southwestern Wyoming.  The Ragged Mountain Area currently is producing more than four million cubic feet (MMcf) of natural gas per day, with anticipated future production of more than 200 MMcf per day.

14.     Gunnison Energy, SG I and SG VII were direct competitors with Buccaneer for production rights in and sale of natural gas from the Ragged Mountain Area.

## GENERAL ALLEGATIONS

15.     The Ragged Mountain Area is located southwest of Carbondale, Colorado in Gunnison and Delta Counties, Colorado.  An estimated 10 trillion cubic feet of natural gas exists in the Area – enough to satisfy the demand of the entire State of Colorado for more than 15 years.

16.     Natural gas is produced at the "wellhead," where it typically is collected and delivered through low-pressure gas gathering pipeline systems to processing facilities.  Natural gas includes various hydrocarbons such as propane, butane, etc., which are removed and recovered from natural gas in liquid form through processing and sold separately.  The remaining gas, known as residue gas, is usually then

transported to high-pressure transmission lines for delivery to end users in interstate commerce.

17.     The Ragged Mountain Area was served by a single natural gas gathering system, processing facility and transportation pipeline known collectively as the Ragged Mountain System.  The System delivered natural gas produced from the Ragged Mountain Area to the high-pressure Rocky Mountain Pipeline for transmission to end users inside and outside the State of Colorado.  The System was capable of gathering, processing and transporting up to 7 MMcf of natural gas per day and up to 20 MMcf per day if compression and processing were upgraded.

18.     Riviera Drilling & Exploration Company ("Riviera") was a family owned business that produced natural gas in the Ragged Mountain Area since 1983.  Natural gas produced by Riviera was gathered, processed, transported and sold through the Ragged Mountain System.  In the mid-1980s, Riviera acquired part of an interest in an oil and gas lease entitling it to develop and produce natural gas from property owned by the McIntyre Livestock Corporation (the "McIntyre Lease") in the Ragged Mountain Area.

19.     Sometime in the late 1990s and early 2000s, the Ragged Mountain Area became an area of interest for the production of natural gas from coal.  For some time, GEC actively competed against SG I and SG VII for production rights entitling them to develop and produce natural gas in the Area.

20.    In January 2001, SG VII acquired the remaining interest in the McIntyre Lease not owned by Riviera, entitling SG VII to develop and produce natural gas from property owned by the McIntyre Livestock Corporation in the Ragged Mountain Area.

21.    In July 2005, GEC and SG VII (through affiliated entities) purchased the Ragged Mountain System.  GEC and SG I also purchased the production rights owned by the previous owners of the System in the Ragged Mountain Area, and GEC and SG I own undivided interests in those production rights.

22.    At or about the same time, GEC entered into an agreement with SG I for an area of mutual interest within the Ragged Mountain Area.  That agreement provided each of them with an interest in production rights acquired by the other in the future.  As a result of that agreement, GEC and SG I no longer competed against each for production rights in the area of mutual interest, including bidding at open auctions for leases of mineral interests on federal lands made available within the area of mutual interest.  Instead, SG I participated at those auctions and successfully obtained all federal leases made available within the area of mutual interest.  Shortly after obtaining those leases, SG I assigned an interest in them to GEC.

23.    Since acquiring the Ragged Mountain System, GEC added a lateral pipeline known as the Sheep Park Gas Lateral Pipeline to the System, and SG I added a lateral pipeline known as the Henderson Lateral Pipeline to the System to accommodate additional natural gas production by them within the Ragged Mountain Area.

24.     As a result of the acquisition of the Ragged Mountain System and subsequent additions made by them to the System, Defendants, by contract and combination, owned and controlled 100% of the then-existing market for natural gas gathering, processing and transportation in the Ragged Mountain Area.

25.     Pursuant to agreement between GEC and SG VII, GEC operated and controlled access to the System, and SG I and SG VII acquiesced in or otherwise agreed to the terms and conditions established by GEC for access to the System.

26.     The Ragged Mountain System was essential to other producers' ability to conduct business in and compete for the production rights in and sale of natural gas from the Ragged Mountain Area.  Defendants had the ability and capacity to provide reasonable access to the System.  Pursuant to the Mineral Leasing Act and 30 U.S.C. § 185(r) and 36 CFR § 251.56, special use permits issued by the United States Forest Service for operation of the System on federal lands required the System to be operated as a common carrier and to "accept, convey, transport, or purchase without discrimination all oil or gas delivered" to it.  Defendants further represented and held themselves out to the public as being common carriers with respect to operation of the System.

27.     There was no practicable or reasonable means of duplicating the Ragged Mountain System because of capital costs and regulatory barriers associated with the construction and operation of gathering systems, processing facilities and transportation pipelines in the Ragged Mountain Area.  Those barriers include the need to obtain special use and other permits from, among other agencies, the United States Forest

Service, the Bureau of Land Management, the U.S. Environmental Protection Agency, the Army Corps of Engineers, the State of Colorado and Gunnison County, Colorado. Potential competitors are prevented from entry into the Ragged Mountain Area by those same factors.

28.    In conjunction with the acquisition of the Ragged Mountain System, GEC and SG I also entered into an agreement for the construction of the Bull Mountain Pipeline and associated compressor station and treating and processing facilities.  The Bull Mountain Pipeline is a 20-inch diameter buried steel gas pipeline that extends approximately 25.5 miles through Gunnison, Delta, Mesa and Garfield Counties, Colorado, and connects to the Questar interstate natural gas pipeline.

29.    The Bull Mountain Pipeline was designed to transport existing and future natural gas production from the Ragged Mountain Area to interstate commerce.  The Bull Mountain Pipeline will be capable of delivering approximately 375 MMcf of natural gas per day into interstate commerce.  The total costs of the Bull Mountain Pipeline and associated facilities to date are approximately $80 million.

30.    Completion of the Bull Mountain Pipeline will further increase GEC and SG I's ability to exclude competition from and control prices for the markets for existing and future production rights in and the gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area.  Because of the capacity of and regulatory barriers associated with the Bull Mountain Pipeline, it will further foreclose entry of competition for the existing and future production rights in and the gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area.

31.     Prior to GEC and SG VII's acquisition of the Ragged Mountain System, the gathering fee for transporting gas on the System ranged from $.33 per Mcf to $.55 per Mcf.

32.     Following the acquisition of the Ragged Mountain System in 2005, GEC, as operator of the System, entered into a short-term natural gas purchase agreement with Riviera that provided for a gathering rate on the System of $0.785 per MMBtu, reduced to $0.50 per MMBtu if production reached a specified level.  That agreement was terminable on five days written notice.

33.     GEC and SG Interests also began discussing buying out Riviera's interests in the Ragged Mountain Area, and GEC prepared a valuation of those interests.

34.     Plaintiff Buccaneer's president, Tony Gale, had more than 20 years of experience in the oil and gas industry and had been previously employed by GEC as senior vice president of operations for five years.  Consequently, Gale had first-hand knowledge of and experience with natural gas exploration, development and production in the Ragged Mountain Area.  Gale had been responsible for developing natural gas wells and obtaining federal, state and local permits for the exploration, development and production of natural gas in the Area.

35.     In the Spring of 2007, Gale approached GEC and asked GEC President Brad Robinson if GEC had a problem with Buccaneer trying to negotiate a purchase of Riviera's assets.  Robinson replied that he thought it would be beneficial to GEC if

Buccaneer bought out Riviera.  The agreement with Riviera took nearly a year to negotiate.

36.     Following efforts by Riviera to enforce GEC's common carrier obligations to provide non-discriminatory access to the Sheep Park Gas Pipeline, GEC informed Riviera by letter dated September 17, 2007, that it was terminating its short-term natural gas purchase agreement with Riviera effective October 1, 2007.  GEC informed Riviera it would begin charging Riviera $1.52 MMBtu to transport natural gas through the Ragged Mountain System.  GEC also informed Riviera that it was changing the historical manner by which Riviera would be allowed to transport gas produced by it through the System

37.     The Ragged Mountain System delivered natural gas into the Rocky Mountain Natural Gas transmission pipeline, which imposed limitations of 2% on the amount of carbon dioxide allowed in gas entering the pipeline.  Some wells on the Ragged Mountain System had produced gas containing levels of carbon dioxide higher than 2%, while other wells on the System had produced gas containing levels of carbon dioxide lower than 2%.  The System historically had met Rocky Mountain Natural Gas' 2% carbon dioxide limitation by using the industry's standard practice of blending all the gas on the System so that, as a whole, it met Rocky Mountain Natural Gas' carbon dioxide limit.

38.     GEC informed Riviera that it would no longer "blend" Riviera's gas with other gas on the System and would require Riviera to treat gas produced from each of its wells to meet Rocky Mountain Natural Gas' 2% carbon dioxide limit before entering

the System, which would require that individual scrubbers be placed on Riviera's wells at significant cost.

39.    Meanwhile, Defendants continued to use the standard practice of blending their own gas on the Ragged Mountain System to meet Rocky Mountain Natural Gas' 2% carbon dioxide limit and later acknowledged that blending gas on the System did not cost them anything.

40.    When Riviera did not comply with GEC's new terms and conditions, GEC shut Riviera's wells in.

41.    In early 2008, Gale again approached Robinson and asked if GEC would transport the gas if Buccaneer entered into a deal to acquire Riviera's production rights. Gale was told that GEC would transport the gas.

42.    On March 4, 2008, knowing that GEC was required to transport gas on the Ragged Mountain System under reasonable, non-discriminatory terms, Plaintiff Buccaneer entered into a Lease and Purchase Agreement with Riviera in which Buccaneer agreed to purchase all of Riviera's assets in the Ragged Mountain Area for $32 million.

43.    The Lease and Purchase Agreement provided Buccaneer with a two-year option period in which Riviera subleased its production rights to Buccaneer in exchange for payments of $45,000 per month.  Buccaneer also was obligated to drill four wells on Riviera's leaseholds (three gas wells and one water disposal well) during the option period.  That obligation was conditioned on Buccaneer obtaining a reasonable gas purchase agreement and required Buccaneer to "use diligent commercial efforts to

obtain a pipeline transportation agreement" to facilitate performance of that obligation.   If

Buccaneer did not exercise the option, Riviera was to retain ownership of the wells and

production from the wells.

44.   Buccaneer anticipated using the cash flow from Riviera's production to

meet most of its monthly payment obligations under the Lease and Purchase Agreement

and to demonstrate production so that it could raise capital to exercise the purchase

option and develop Riviera's production rights.

45.   Immediately after entering into the Riviera Lease and Purchase

Agreement, Buccaneer President Gale contacted GEC President Robinson and

requested an agreement to transport gas on the Ragged Mountain System.

46.   GEC President Robinson prepared a "transportation term sheet" that set

out terms for Buccaneer's transportation of gas from Riviera's leasehold interests on the

Ragged Mountain System and the Bull Mountain Pipeline.   The sheet indicated that

Buccaneer would be allowed to transport gas for $1.52 per MMBtu for the first 1,000,000

MMBtus and then $1.00 per MMBtu thereafter for all gas transported.   The sheet further

provided GEC with an option to purchase up to a 30% working interest in all the Riviera

production rights acquired by Buccaneer in exchange for a reduction in the

transportation rate from $1.52 per MMBtu to $0.25 per Mcf.

47.   However, GEC did not provide Buccaneer a draft transportation

agreement until June 30, 2008, when it proposed to Buccaneer a transportation

agreement that again demanded $1.52 per MMBtu.   The proposed agreement further

provided that GEC could interrupt the gathering, processing and transportation of

Buccaneer's gas at any time for any reason and that GEC was not obligated to curtail or otherwise interrupt transportation of its own gas to maintain transportation of Buccaneer's gas.

48.    Buccaneer responded to GEC's proposed transportation agreement on July 12, 2008.  Although Buccaneer believed the gathering rate of $1.52 per MMBtu was unreasonable, Buccaneer acquiesced to that rate because it had no alternative means of transporting and selling its gas.  However, Buccaneer deleted the provisions regarding GEC's ability to interrupt service at its sole discretion and qualified GEC's ability to curtail service to conform to its common carrier obligations under applicable permits and the Mineral Leasing Act.

49.    On August 5, 2008, GEC returned its proposed transportation agreement to Buccaneer.  GEC reinstated the provisions regarding GEC's ability to interrupt service at its sole discretion and removed the qualification regarding GEC's ability to curtail service to conform to its common carrier obligations under applicable permits and the Mineral Leasing Act.  GEC also increased the gathering fee it was demanding from the previously quoted $1.52 per MMBtu to $3.92 per MMBtu.

50.    Buccaneer and its attorney then met with GEC and its attorney in an effort to work out a mutually agreeable transportation agreement.  Buccaneer requested the information GEC relied on to justify the high transportation rate.  GEC refused to provide information about the costs and other economic factors forming the basis for those charges, which reflect monopolistic pricing.

51.     In an attempt to salvage the Lease and Purchase Agreement with Buccaneer, Riviera resumed its own, separate efforts to obtain access to the Ragged Mountain System.  On August 27, 2008, Riviera asked GEC for a transportation agreement for the Ragged Mountain System and one for the Sheep Gas Lateral Pipeline so it could drill a new well and hook up an existing well.  Riviera also asked if it could locate a single carbon dioxide treatment unit on either its Federal #30-2 well location or its Federal #10-90-32 well location to treat gas from all its wells as it flowed through the Ragged Mountain System.  Riviera also asked SG I for a transportation agreement for the Henderson Lateral Pipeline so it could drill a well and hook up yet another existing well.

52.     GEC provided Riviera with the same interruptible transportation agreement it had provided to Buccaneer, with a gathering rate of $3.92 per MMBtu and indicated that a similar agreement would apply to transportation on the Sheep Park Gas Lateral Pipeline.  GEC indicated that Riviera might be able to locate a single carbon dioxide treatment unit at its Federal #30-4 well location.  However, when Riviera pursued that offer, GEC withdrew its acceptance.  GEC told Riviera that its gas would have to be treated for $CO_2$ removal before it entered the Ragged Mountain System.  GEC also informed Riviera that it would need production data from the well before it could be hooked up to the Sheep Gas Lateral Pipeline.

53.     SGI responded to Riviera's request for transportation on the Henderson Lateral Pipeline by indicating that Riviera would have to provide production data from the well to be drilled and hooked up.

54.     Riviera objected to GEC's and SG I's requirements that it drill wells and provide production data before knowing the terms of transportation, as it would be imprudent to invest time and money into drilling and completing wells without knowing whether it would be allowed reasonable access to a pipeline.

55.     On October 13, 2008, Buccaneer informed GEC that its $3.92 per MMBtu gathering rate "was the equivalent to a denial of access to the pipeline."

56.     In September 2008, Buccaneer offered to purchase a 10% interest in the Bull Mountain Pipeline for 15% of the pipeline's cost.  SG Interests responded by indicating that it would sell a 10% interest in the Bull Mountain Pipeline for 20% of the pipeline's cost, or for a 100% promote.

57.     On November 24 and 26, 2008, Buccaneer again requested transportation on the Ragged Mountain System and the Bull Mountain Pipeline and offered to buy a portion of the Ragged Mountain System.

58.     On December 11, 2008, GEC declined Buccaneer's offer.  However, GEC proposed a "broader transaction" in which GEC would participate in the development of Riviera's production rights.  GEC's participation in the development of Riviera's production rights was unacceptable to Buccaneer because it would jeopardize control over the investment and the timing of the development necessary to fund the acquisition of those interests.

59.     The effect of the price increases and other conditions imposed by Defendants rendered: (1) access to the Ragged Mountain System unreasonable and uneconomic; (2) Buccaneer's performance under the Lease and Purchase Agreement

impossible; and (3) prevented Buccaneer and other competitors from acquiring production rights and selling natural gas from the Ragged Mountain Area.

60.    Throughout the relevant time period, Buccaneer expended substantial time and resources in complying with its obligations under the Lease and Purchase Agreement and in developing Riviera's interests in the Ragged Mountain Area for the increased production and sale of natural gas contemplated under the Agreement. Among other things, Buccaneer commissioned an independent evaluation of Riviera's leasehold interests, continued to make monthly payments to maintain its option under the Lease and Purchase Agreement and hired contractors who staked potential well locations in preparation for the development of Riviera's interests.

61.    A readily available market has existed for the sale of natural gas produced from the Ragged Mountain Area, and natural gas brokers and other purchasers were ready, willing and able to enter into contracts for such gas.  Defendants continued to invest in drilling operations and the construction of the Bull Mountain Pipeline throughout the relevant time period with the reasonable expectation of selling gas produced from the Ragged Mountain Area.

62.    Defendants' conduct had the following effects, among others, within the relevant markets and areas of commerce:

    a.    Competition  for production rights in and thegathering, processing, transportation and  sale of natural gas from the Ragged Mountain Area has been reduced or eliminated,

b.      Consumers of gas gathering, processing and transportation, such as Riviera, Buccaneer and other oil and gas producers, have been subjected to increased prices and reduced output for those services,

c.      Consumers of natural gas from the Ragged Mountain Area have been subjected to increased prices and reduced output for that product,

d.      Defendants have acquired and exercised the power to exclude competition and control prices for gathering, processing and transporting natural gas,

e.      Defendants have used the power to exclude competition and control prices for gathering, processing and transporting natural gas to acquire the power to exclude competition and/or control prices for production rights and sale of natural gas, and

f.      Natural gas production and sales have been reduced.

## RELEVANT MARKETS AND AREAS OF COMMERCE

63.    The Ragged Mountain Area constitutes the area of effective competition and is the relevant geographic market.  The term "Ragged Mountain Area" as used in this Complaint refers to that area encompassed within Townships 10 South to 12 South and Ranges 89 West to 91 West.

64.    There is no practical substitute for productionrights and the gathering, processing, transportation and sale of natural gas, which constitute the relevant product markets and/or areas of commerce.

## FIRST CLAIM FOR RELIEF
## (Refusal to Deal in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

65.     Plaintiff realleges and incorporates all previous paragraphs of this First Amended Complaint.

66.     Defendants had exclusive ownership and control over the Ragged Mountain System, which was essential to effective competition for production rights and the sale of natural gas from the Ragged Mountain Area, and had the ability to control prices and exclude competition in the Ragged Mountain Area for production rights and the gathering, processing, transportation and sale of natural gas.

67.     Defendants contracted, combined and conspired to restrain competition in the relevant markets.

68.     Defendants took steps in furtherance of their contract, combination and conspiracy by, among other things, refusing to deal with, or to deal only on specific terms with, competitors and consumers of natural gas gathering, processing and transportation services so as to deny reasonable access to the Ragged Mountain System.

69.     Defendants' conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

70.     As a result of Defendants' conduct, Buccaneer suffered injury to its business or property.

## SECOND CLAIM FOR RELIEF
## (Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

71.     Plaintiff realleges and incorporates all previous paragraphs of this First Amended Complaint.

72.     Defendants combined and conspired to monopolize the markets for production rights and the gathering, processing, transportation and sale of natural gas in the Ragged Mountain Area.

73.     Defendants took steps in furtherance of their combination and conspiracy by, among other things,

a.     acquiring 100% ownership and control over the Ragged Mountain System and the Bull Mountain Pipeline;

b.     refusing to deal with, or to deal only on specific terms with, competitors and consumers of natural gas gathering, processing and transportation services so as to deny reasonable, non-discriminatory access to the Ragged Mountain System;

c.     changing the historical terms of access to the Ragged Mountain System without economic justification;

d.     refusing to provide terms and conditions of access to the Ragged Mountain System for new wells, thereby preventing development of new production because of the economic uncertainty of the cost of access to markets;

e.     allowing themselves access to the Ragged Mountain System on terms and conditions more favorable than those available to competitors; and

f.     entering into agreements to share in each other's natural gas production rights in the Ragged Mountain Area.

74.     Defendants' conduct was undertaken with the specific intent to monopolize production rights in and the gathering, processing, transportation and sale

of natural gas from the Ragged Mountain Area and had an effect upon an appreciable amount of interstate commerce.

75.     Defendants' conduct violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

76.     As a result of Defendants' conduct, Buccaneer suffered injury to its business or property.

<b><u>THIRD CLAIM FOR RELIEF</u></b><br><b><u>(Attempt to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)</u></b>

77.     Plaintiff realleges and incorporates all previous paragraphs of this First Amended Complaint.

78.     To the extent Defendants acted as a single economic entity, they engaged in predatory or anticompetitive conduct as described above with the specific intent to monopolize production rights in and the gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area.

79.     Defendants, by virtue of the barriers to entry and other facts described above, had a dangerous probability of success in monopolizing production rights in and the gathering, processing, transportation and sale of natural gas from the Ragged Mountain Area, as demonstrated by their 100% share of the market for gathering, processing and transportation of natural gas in the Ragged Mountain Area, their nearly 100% share of the market for the sale of natural gas from the Ragged Mountain Area, and more than 70 % share of the market for production rights in the Ragged Mountain Area.

80.     Defendants' conduct violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

81.     As a result of Defendants' conduct, Buccaneer suffered injury to its business or property.

## FOURTH CLAIM FOR RELIEF
### (Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

82.     Plaintiff realleges and incorporates all previous paragraphs of this First Amended Complaint.

83.     To the extent Defendants acted as a single economic entity, they possessed – by virtue of the barriers to entry and other facts described above -- the power to control prices and exclude competition for production rights in and the gathering, transportation, processing and sale of natural gas from the Ragged Mountain area, as demonstrated by their 100% share of the market for gathering, processing and transportation of natural gas in the Ragged Mountain Area, their nearly 100% share of the market for the sale of natural gas from the Ragged Mountain Area, and more than 70 % share of the market for production rights in the Ragged Mountain Area.

84.     Defendants willfully acquired or maintained that power through the conduct described above rather than growth or development as a consequence of a superior product, business acumen or historic accident.

85.     Defendants' conduct violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

86.     As a result of Defendants' conduct, Buccaneer suffered injury to its business or property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

a.      With respect to Buccaneer's First Claim for Relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, an award of threefold the amount of damages actually sustained by Buccaneer, in an amount to be determined at trial, and attorney fees and costs;

b.      With respect to Buccaneer's Second Claim for Relief under Section 2 of the Sherman Act, 15 U.S.C. § 2,  an award of threefold the amount of damages actually sustained by Buccaneer, in an amount to be determined at trial, and attorney fees and costs;

c.      With respect to Buccaneer's Third Claim for Relief under Section 2 of the Sherman Act, 15 U.S.C. § 2,  an award of threefold the amount of damages actually sustained by Buccaneer, in an amount to be determined at trial, and attorney fees and costs;

d.      With respect to Buccaneer's Fourth Claim for Relief under Section 2 of the Sherman Act, 15 U.S.C. § 2,  an award of threefold the amount of damages actually sustained by Buccaneer, in an amount to be determined at trial, and attorney fees and costs;

e.      Interest and any other damages, fees and costs to the fullest extent permitted under all applicable law, and

f.      Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Dated:  April 10, 2013.

Respectfully submitted,

*signed original on file at Peters | Mair | Wilcox*


s/Ronald L. Wilcox
Steven C. Peters
Ronald L. Wilcox
Todd E. Mair
Peters | Mair | Wilcox
1755 Blake Street, Suite 240
Denver, CO  80202
Phone:  (303) 393-1704
Fax:      (303) 399-8333
E-mail:  speters@peterslaw.net
            rwilcox@peterslaw.net
            tmair@peterslaw.net

and

William A. Cohan
Gabriel Cohan
William A. Cohan, P.C.
P.O. Box 3448
Rancho Santa Fe, CA 92067
Phone:    (858) 832-1632
E-mail:    bill@williamcohan.com

ATTORNEYS FOR PLAINTIFF
BUCCANEER ENERGY (USA) INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 10th day of April 2013, I electronically filed the foregoing **FIRST AMENDED COMPLAINT** with the Clerk of Court using CM/ECF, which will send notification of such filing to the following email addresses:

L. Poe Leggette
Fulbright & Jaworski L.L.P.
1200 17th Street, Suite 1000
Denver, CO  80202
pleggette@fulbright.com

Layne E. Kruse
Fulbright & Jaworski L.L.P.
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
lkruse@fulbright.com

Timothy R. Beyer
Peter J. Korneffel
Bobbee J. Musgrave
Kathryn R. DeBord
Bryan Cave LLP
1700 Lincoln Street, Suite 4100
Denver, CO  80203
tim.beyer@bryancave.com
peter.korneffel@bryancave.com
bobbee.musgrave@bryancave.com
katie.debord@bryancave.com

s/Ronald L. Wilcox
Ronald L. Wilcox
Peters | Mair | Wilcox
1755 Blake Street, Suite 240
Denver, CO  80202
Phone:      (303) 393-1704
Fax: (303) 399-8333