IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 12-cv-01618-RPM

BUCCANEER ENERGY (USA) INC., a Nevada corporation,

      Plaintiff,

v.

GUNNISON ENERGY CORPORATION, a Delaware corporation,
SG INTERESTS I, LTD., a Texas limited partnership, and
SG INTERESTS VII, LTD., a Texas limited partnership,

      Defendants.

---

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

      The defendants filed motions for summary judgment seeking dismissal of this antitrust action. The motions have been fully briefed with extensive evidentiary displays from which the following statement of facts has been derived giving the plaintiff the benefit of any matters that are disputed.

      Before 2005, BDS International, LLC ("BDS") owned the Ragged Mountain Gathering System for the collection and transportation of natural gas from wells in the Ragged Mountain Area through a 6-inch diameter pipeline called the Ragged Mountain Pipeline. The Ragged Mountain Pipeline carried natural gas approximately 20 miles to an interconnection on the larger Rocky Mountain Natural Gas Pipeline, owned by a regulated gas utility named SourceGas.

Defendants Gunnison Energy Corporation ("Gunnison") and SG Interests I, Ltd. and SG Interests VII, Ltd. ("SG") began acquiring mineral leases in that area in 2000 and 2001. They became producers of gas from wells drilled on their leases.

BDS went into bankruptcy in late 2004, and in June, 2005, Gunnison and SG jointly acquired the pipeline and gathering system together with some leasehold interests from BDS in the bankruptcy proceeding.

The defendants entered into a written "Area of Mutual Interest Agreement," dated June 3, 2005, agreeing to grant each other an option to purchase a 50% participation in any leases or other mineral interests each acquired in the area. They also granted each other the option to participate equally in the planning, permitting, construction, operation and ownership of any pipeline project of the other.[1]

In July, 2005, the defendants entered into a Pipeline Operating Agreement designating Gunnison as operator of the Ragged Mountain Pipeline with SG's participation through a management committee.

Recognizing a need for increased capacity, SG had begun the process for regulatory approval for construction of a new 20-inch pipeline to be called the Bull Mountain Pipeline designed to extend 25.5 miles through Gunnison, Delta, Mesa and Garfield counties to connect with the Questar interstate pipeline.

---

[1] In early 2005, Gunnison and SG had agreed to cooperate in the bidding for certain oil and gas leases in the Ragged Mountain Area being sold by the Bureau of Land Management. In a written Memorandum of Understanding dated February 8, 2005, they agreed that SG would submit bids at a mutually established ceiling price and further agreed that as to any lease for which SG was the successful bidder, SG would assign a 50% interest in the lease to Gunnison for half the bid price.

Riviera Drilling and Exploration Company ("Riviera") was the owner of mineral leases with producing gas wells in the Ragged Mountain Area.[2] Riviera's eleven wells on that property included eight that were capable of producing and three that were considered proved but not producing. Riviera entered into a Short-Term Natural Gas Purchase Agreement with Gunnison in September, 2005, whereby Gunnison purchased gas from Riviera's wells at a price received by Gunnison, deducting $0.785 per MMBtu for transportation through the Ragged Mountain Pipeline.

In 2006, Gunnison exercised the option provided by the Area of Mutual Interest Agreement to participate with SG in the construction of the Bull Mountain Pipeline.

Tony Gale was vice-president of oil and gas development for Gunnison with knowledge of Riviera's leases when he left that position in January, 2007, to work for a Canadian oil and gas company.

Gunnison and SG attempted to purchase Riviera's assets. After Riviera declined to sell, in September, 2007, Gunnison notified Riviera that the cost of transportation of its gas would be increased to $1.52 per MMBtu with additional costs and additional requirements, effective October 1, 2007.

Riviera did not agree to those terms and its gas wells were shut-in. Gunnison again sought to buy Riviera's assets in January, 2008, but its overtures were rejected.

---

[2]Riviera is owned by Thurner Industries, a privately-held corporation owned my members of the Thurner family. At different times, Thurner Industries has been owned by different members of the Thurner family, in different percentages. Riviera is controlled by Scott Thurner and his sons, Jacob and Samuel Thurner.

In February, 2008, Buccaneer Energy Corporation (USA), Inc. ("Buccaneer") was incorporated in Nevada, as a subsidiary of Buccaneer Canada, owned by Canadian investors John Hislop, Brad Windt and Gordon Nielsen (collectively, "the Vancouver Group"). The Vancouver Group employed Cliff Adams, Michael Lou, and Victor Barcot – investment bankers from Houston, Texas (collectively, "the Houston group") – as a management team for various investments. Buccaneer USA and its Canadian parent were companies created by the Vancouver and Houston Groups to acquire Riviera's leases. Tony Gayle was appointed president of Buccaneer.

On March 4, 2008, Buccaneer and Riviera entered into a Lease and Purchase Agreement whereby Buccaneer agreed to pay $45,000 per month for the exclusive sublease and operation of the Riviera leases for a two-year period. In addition to the lease payment obligation, Buccaneer agreed to drill four new gas wells (subject to Buccaneer's obtaining a transportation agreement for transportation of gas from those wells), use diligent efforts to obtain a pipeline transportation agreement, acquire rights of way, and lay pipeline needed to connect three wells to the existing Ragged Mountain Gathering System. The Lease and Purchase Agreement also granted Buccaneer an option to purchase the Riviera assets anytime within the two years for $32 million.

From 2005 through 2007, Riviera's producing wells had yielded approximately $28,000 per month. When Buccaneer entered into the Lease and Purchase Agreement, Riviera's wells had been shut in for approximately six months. Buccaneer planned to pay the $45,000 monthly lease payments by reestablishing production from the eight wells and bringing the other wells into production. To perform all of its obligations under the Lease and Purchase Agreement and exercise the $32 million option, Buccaneer intended to obtain capital through an affiliate,

Warrior Energy, N.V. ("Warrior"), which in turn would need to raise money through private or public equity markets.

Gayle formally asked Gunnison for a transportation agreement on the Ragged Mountain Pipeline on March 3, 2008. He also had a discussion with Robbie Guinn of SG about Buccaneer's interest in participating in construction of the Bull Mountain Pipeline, which was expected to be completed in 2009.

On June 30, 2008, after several exchanges between Gayle and Gunnison's president Brad Robinson, Gunnison sent a draft transportation agreement to Buccaneer. Gunnison's draft provided for a rate of $1.52 per MMBtu for interruptible service. Buccaneer responded with a revised draft on July 12, 2008, accepting the rate but objecting to interruptible service and adding a requirement that Gunnison comply with common carrier obligations required under its government permit to operate the pipeline.

In response, Gunnison sent another draft agreement on August 5, 2008, increasing the rate to $3.92 per MMBtu, insisting on the right to interrupt service at its sole discretion and deleting the common carrier provision. Buccaneer did not respond with any other offer.

Riviera requested a transportation agreement from Gunnison on August 27, 2008, to which Gunnison responded with the same draft it had sent to Buccaneer.

On September 2, 2008, Buccaneer made an offer to SG to buy a 10% interest in the Bull Mountain Pipeline for 15% of the cost of construction, expected to be approximately $50 million. SG countered, proposing to sell a 10% interest for 20% of the cost. Buccaneer did not respond to that counterproposal.

From March through October 2008, Buccaneer paid the monthly $45,000 payments owed to Riviera under the Lease and Purchase Agreement with funds provided by its investors (Hislop, Nielsen, Windt, Adam, Lou and Barcot), who together had contributed a total of $558,000 through capital contributions and loans. Buccaneer had incurred start up costs of approximately $1.2 million.

Natural gas prices began to fall in July, 2008, and by September, 2008, the price went from almost $9 per MMBtu to below $2 MMBtu. In September 2008, there was a "meltdown" in capital markets, led by the Lehman Brothers bankruptcy filing. In late fall, 2008, Buccaneer's investors were not willing to put in more money to keep the Riviera project going, and Warrior did not have the ability to finance Buccaneer.

Buccaneer stopped making the monthly lease payments to Riviera. Riviera gave notice of default to Buccaneer on November 6, 2008, and terminated the Lease and Purchase agreement on December 1, 2008.

Riviera sued Gunnison and SG on November 14, 2008, in an action captioned *Riviera Drilling & Exploration Company v. Gunnison Energy Corporation, SG Interests I, LTD, and SG Interests VII, LTD*, in the United States District Court for the District of Colorado, Civil Action No. 08-cv-02486-REB-CBS, alleging antitrust and other claims ("the *Riviera* action). After plaintiff's counsel withdrew shortly before a scheduled trial, Riviera filed for Chapter 11 bankruptcy relief on February 2, 2010. On February 17, 2010, the presiding judge dismissed the *Riviera* action with prejudice for failure to prosecute.

This civil action was filed on June 21, 2012.

On December 21, 2012, Riviera's Chapter 11 plan was confirmed. Gunnison agreed to fund the bankruptcy estate in exchange for an interest in Riviera's leases which at that time was 43% with Thurner family members holding the majority interest. An adversary proceeding among the Plan Administrator, Gunnison and the Thurners was resolved by a settlement agreement resulting in Gunnison obtaining the full leasehold interests in the Riviera acreage.

The Bull Mountain Pipeline became fully operational in 2014 with the connection to the Questar interstate pipeline. The Ragged Mountain Gathering System compressor station was decommissioned in 2014, and the Ragged Mountain Gathering System no longer flows gas to the Rocky Mountain Natural Gas Pipeline.[3]

In this civil action, Buccaneer claims that Gunnison and SG engaged in a conspiracy in restraint of trade in violation of Section 1 and conspiracy to monopolize under Section 2 of the Sherman Act, injuring competition in the market for production of gas in the Ragged Mountain Area and for the downstream sale of gas.

To establish its Sherman Act § 1 claim, Buccaneer most prove that "the defendant entered a contract, combination or conspiracy that unreasonably restrains trade in the relevant market." *Full Draw Prod. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999) (quoting *TV Communic'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992). To establish its claim for conspiracy to monopolize under Sherman Act § 2, Buccaneer must show "conspiracy, specific intent to monopolize, and overt acts in furtherance of

---

[3]Although the Bull Mountain Pipeline was completed in 2009, delays and disputes precluded it from commencing regular operations until 2014.

the conspiracy." *Full Draw Prod.*, 182 F.3d at 756 (quoting *Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n of Kan.*, 891 F.2d 1473, 1484 (10th Cir.1989)).

Buccaneer must also establish antitrust standing, which requires "(1) an 'antitrust injury'; and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws." *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1254 (10th Cir. 2003) (quoting *Sports Racing Serv. Inc. v. Sports Car Club of Am., Inc*., 131 F.3d 874, 882 (10th Cir.1997)). An antitrust plaintiff "must prove more than injury causally linked to an illegal presence in the market," but "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which make the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Because Buccaneer was not a functioning oil and gas company when it contracted with Riviera, Buccaneer must demonstrate that it was prepared to enter the market. *Ashley Creek Phosphate*, 315 F.3d at 1254; *see also Bourns, Inc. v. Raychem Corp*., 331 F.3d 704, 711 (9th Cir. 2003) (explaining that intent and preparedness are necessary because "[o]nly an actual competitor or one ready to be a competitor can suffer antitrust injury").

The defendants filed motions for summary judgment seeking dismissal of this action on multiple grounds, some of which were rejected in this Court's order entered on August 21, 2015. The defendants' motions for summary judgment are granted because Buccaneer lacks evidence showing that the defendants caused or were capable of causing injury to competition in a defined market, as opposed to simply harm to Buccaneer, and because Buccaneer has not established antitrust standing.

With its opposition brief, the plaintiff submitted reports of its retained experts Michael J. Harris, Ph.D. and Mark J. Dwyer, Ph.D; Stephen A. Duree; William Koch, and Letha Lencioni. The defendants have filed motions to exclude the testimony of those witnesses. For the purpose of evaluating the sufficiency of the plaintiff's evidence, all of the plaintiff's evidence has been considered, including the reports of those witnesses.[4]

The plaintiff contends that there are two relevant product markets – the market for "production rights" in the Ragged Mountain Area and the market for downstream sales of gas from that area.

The Ragged Mountain Area has not been defined geographically with any precision. At oral argument, plaintiff's counsel agreed that it was essentially Gunnison County and part of Delta County, Colorado. The only meaningful definition for the term "production rights" is mineral leases (or mineral interests) that provide the right to extract gas production. (Hr'g Tr. at 7-8, Aug. 26, 2015.)

The plaintiff's business plan to enter the production market was to drill additional wells and improve existing wells on the Riviera property. It did not include the acquisition of new leases in competition with the defendants. The success of that plan required access to the small pipeline existing in 2008 and access to the Bull Mountain Pipeline, to connect with an interstate line and sale of gas to SourceGas, the dominant buyer of gas in the area. The existing line was

---

[4]The plaintiff has suggested through the opinion of William W. Koch that the defendants should be considered as providers of transportation services. That is described as the midstream market. That, however, is not a fair assessment of the defendants, whose primary business is the production and sale of gas from their properties.

underutilized at that time but more pipeline capacity would be needed which was why SG and Gunnison were building the larger Bull Mountain Pipeline.

It is assumed that a jury could find that the defendants agreed that the change in the agreement with Riviera was motivated by a plan to acquire its leases to add to their shared production of gas. A jury could also find that the defendants never intended to negotiate an agreement acceptable to Buccaneer for transportation of gas produced from the Riviera leases. In short, reasonable jurors could conclude the defendants intentionally blocked Buccaneer from entering into competition with them as producers of gas in the Ragged Mountain Area.

The defendants contend that their refusal to deal with Buccaneer was within their freedom of choice recognized by the United States Supreme Court in *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). The plaintiff argues that *Trinko* is not relevant because that case involved a single player and Buccaneer alleges a concerted refusal to deal akin to a group boycott by competitors in a horizontal market – that is, the production of gas from the Ragged Mountain Area.

Accepting the plaintiff's definition of the relevant geographic market, the plaintiff has shown sufficient evidence to support a finding that these two defendants demanded unreasonable terms for transportation through the existing pipeline to force Riviera out of and to prevent Buccaneer from entering the market for acquiring oil and gas leases in that region with the intent to enable the defendants to control the price and terms of new leases. That can be an injury to competition in the market for new leases. But Buccaneer has not shown the ability or even the intent to enter into that market. The plaintiff's request was access to the Ragged Mountain Pipeline to enable it to purchase Riviera's leases and produce gas from existing and newly drilled

wells on those leases.  The production of gas from existing leases is not a relevant market for the antitrust claims.

The defendants agreed not to compete with each other in bidding for federal leases and acquiring leases from private owners.  There were other companies owning mineral leases in the Ragged Mountain Area.  Willsource Enterprises ("Willsource") has owned leases during the relevant time period, and it has been able to maintain production rights there.  Petrox Resources ("Petrox") acquired 5,750 acres in the Ragged Mountain Area in 2000 and has retained its leaseholds.  In 2010, Gunnison was outbid at a BLM auction for leases on federal lands within the Ragged Mountain Area.

Even if it is assumed that the defendants had a monopsony in the market for new leases, their concerted elimination of a single potential competitor would not violate the antitrust laws because that would not prevent other bidders from seeking entry into that market.

The plaintiff's reliance on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) is misplaced.  This is not like the *Aspen Ski* case where there was liability for terminating an existing cooperative pricing system to enable skiers to use the plaintiff's ski facility on a common ticket with the facilities owned by Aspen.  The market for mineral leases is an open market for new competition.

Even if Riviera might have fit within the exception to the freedom to deal or not deal with a competitor recognized in *Trinko*, it is not available to Buccaneer, a new entrant with a speculative business plan and no prior cooperative relationship with the defendants.

A transportation agreement involves more than setting a price for delivery of the gas through the pipeline.  There are mutual promises of performance of obligations with risks of non-

performance by the producer affecting the operation of the pipeline and the quality of the gas flowing in it.

The evidence shows that Gunnison wanted both information and assurances from Buccaneer that it could perform those obligations. The transportation situation was in a dynamic state in 2008. While the existing pipeline had capacity for more gas than what was flowing from the defendants' wells, it was apparent to all parties that additional capacity must be added for the expected increased production from Buccaneer and from the defendants. The Bull Mountain pipeline was being built at a large cost requiring the investment of SG and Gunnison. That is an investment that is encouraged in the American economic system. Buccaneer asked to participate in that investment and says it was denied because SG's offer was not economically reasonable. The plaintiff did not proceed with any further negotiations and at the time it did not have the financial resources to invest. There is no evidence that the Buccaneer investors were willing or capable of making that additional investment.

The full cost of the Bull Mountain Pipeline was uncertain. It was not fully operational until 2014. The law does not require a business entity to accept a new undercapitalized company to join in a venture to enable increased production. SG had a legitimate business reason to reject Buccaneer's offer to invest in the Bull Mountain project. This is like a producer of agricultural products refusing to accept an offer of a competitor to join in the purchase of a fleet of delivery trucks to enable both producers to transport more products to the market.

The defendants' conduct is not actionable under the antitrust laws. Simply stated, the plaintiff's showing is that the defendants demanded unreasonable terms for access to the Ragged Mountain Pipeline with the intent to prevent Buccaneer from acquiring the Riviera leases and

thereby prevented Buccaneer from competing with the defendants in the production of gas from their own wells. Gunnison eventually acquired those assets, but the defendants' conduct toward Buccaneer did not affect the market for acquiring new leases on other lands in Gunnison and Delta counties. Acquiring the Riviera leases did not enable the defendants to suppress the value of those properties.

Buccaneer suggests that the downstream market for the sale of gas has been adversely affected by the defendants' exclusion of the plaintiff from the Ragged Mountain Pipeline. The evidence does not support such a finding. The defendants have submitted evidence showing that they did not have the power to increase the prices paid by Source Gas, the primary buyer and distributor of the gas coming through the pipeline. The defendants's evidence shows that they are "price takers" with respect to the sale of gas produced from the Ragged Mountain Area. The plaintiff's evidence is not sufficient to support a contrary characterization of the market for downstream sales of gas.

Even if Buccaneer could show an antitrust violation, it still must establish antitrust standing. To do so, Buccaneer must prove that it was prepared to enter the market, and Buccaneer has not made that showing. Factors relevant to evaluation of an antitrust plaintiff's intention and preparedness to enter a new market include "ability to finance the business and purchase the necessary facilities; consummation of contracts towards the purchase of the business; affirmative action by the plaintiff to enter business; and the background and experience of the plaintiff." *Curtis v. Campbell-Taggart, Inc.*, 687 F.2d 336, 337-38 (10th Cir. 1982).

The only conclusion to be drawn from the evidence is that Buccaneer's business plan for developing the Riviera assets was not viable in the summer and fall of 2008, when Gunnison

rejected Buccaneer's proposed terms for a transportation agreement and SG rebuffed Buccaneer's proposal to participate in the Bull Mountain Pipeline. Immediately upon executing the Lease and Purchase Agreement, Buccaneer obligated itself to lease payments of $1,040,000, plus the costs of bringing the Riviera wells online in a manner that would improve production to levels sufficient to attract outside investors. Buccaneer was undercapitalized. It had no ability to fulfill its obligations under the Lease and Purchase Agreement or raise additional capital without completing numerous tasks that Buccaneer had not completed or had barely begun, or – as in the case of the title work – did not complete on time.[5]

Notably, Buccaneer's plan to obtain public financing through Warrior in Canada was subject to Canadian securities law, which required Buccaneer to obtain a reserve report. Buccaneer had commissioned another company (Netherland, Sewell & Associates, Inc.) to prepare a resource analysis of the Riviera interests in April, 2008, and received a draft of the report in June, 2008, but Buccaneer did not receive the completed version until late 2008, by which time gas prices and the financial markets had collapsed. No agreement with Warrior was ever signed.

The plaintiff seeks refuge in the "futility doctrine," arguing that the defendant's refusal to negotiate a transportation agreement made the other steps of its business plan impossible or futile. That argument fails. In *Ashley Creek,* the Tenth Circuit explained that the futility doctrine does not excuse an antitrust plaintiff from performing the most basic preparatory steps. 315 F.3d at

---

[5]The Lease and Purchase Agreement provided a period for Buccaneer to identify title defects and included a provision for downward adjustment of the $32 million option price in an amount equal to the value of any title defects that Buccaneer might identify and which were not cured or waived. Buccaneer undertook the title work but did not complete it within the deadline. When Buccaneer did conclude the title work, substantial title defects were identified.

1258-59. Here, reasonable jurors could conclude only that Buccaneer was not ready to enter the market because it lacked the financial ability to fulfill its obligations under the Lease and Purchase Agreement.

The plaintiff's theory of injury (which is relevant both to antitrust injury and damages) ignores the economic collapse that occurred in September 2008, and the testimony Buccaneer investors Adams, Barcot and Lou, who did not blame the defendants for the failure of the Buccaneer business venture. Reasonable jurors could not conclude that Buccaneer ceased operations due to the lack of a transportation agreement.

Accordingly, it is

ORDERED that defendant Gunnison Energy Corporation's motion for summary judgment [Dkt. No. 89] is granted, and it is

FURTHER ORDERED that defendant SG Interests' motion for summary judgment [Dkt. No. 94, as supplemented by Dkt. No. 102] is granted.

The clerk shall enter a final judgment dismissing all of the plaintiff's claims and this civil action with an award of defendants' costs.

Dated:  September 25, 2015

BY THE COURT:

s/Richard P. Matsch
_____
Richard P. Matsch, Senior Judge